We're going to begin with counsel for the appellant, Mr. Willis. He has reserved five minutes of rebuttal time. Mr. Willis, let me recognize you. Good morning, your honors. May it please the court, opposing counsel, and the justices of this court, that I am here today to testify in support of Mr. Asif Sayeed. I want to thank you all this morning at the top of my remarks for holding this argument in such extraordinary circumstances as face our city, our state, and our nation. These circumstances remind us far too gravely of the importance of the protection of public medical programs for senior citizens in this state and in this country. And that is the purpose behind the Anti-Kickback Statute and the False Claims Act application to the Medicare program, which goes to the heart of the issues before this court and the issues on trial before the district court. Public medical programs for seniors are a critical resource, and in times such as these, their critical nature could not be more clear or more grave. The dissipation or the misuse of the assets of public programs for seniors has long been an issue of great concern to the Congress, and to that end, the Anti-Kickback Statute has been well developed both in case law and regulatory law. The case law and the regulations implementing the Anti-Kickback Statute make clear that that statute is to be read very broadly to cover a wide range of conduct, far beyond direct quid pro quo bribery agreements between individuals who can refer business for ultimate payment by government health care programs and people who provide that care. The definition of what constitutes a referral is the key question before this court on appeal. And the district court's decision in this case never grapples with what is and is not a referral, and in that way, the district court's decision went awry and is an error. This court, in the Patel case, laid out a very helpful framework for understanding what constitutes referrals and the appropriate scope. And I think in a very apt analogy, liken those types of transactions to a gatekeeping function, where one entity may have the ability to exercise the role of a gatekeeper with respect to who should receive medical care from government programs and from whom those patients should receive that care. The district court's decision here is remarkably scant on the application of law and instead makes the conclusion that because the witnesses testified that they did not believe there was payment for referrals, the payment for referrals did not take place. In this way, the district court has abdicated the legal definition of referrals to lay witnesses, and in doing so, has used a definition of referrals that does not reflect the law in this circuit. The testimony before the district court was clear, and indeed, in the manner in which it was recounted in the district court's opinion, and in the response brief by a defendant at the lease, also makes clear that the payments that were made from defendants to HCI altered the gatekeeping relationship that HCI exercised with respect to HCI. Put simply, and not to be colloquial, the relationship between HCI and MPI is either an illegal kickback scheme, or it is the most brilliant marketing database idea I have ever seen. MPI identified an amazing trove of potential clients for MPI's related businesses, vital home health and physician care services, with common ownership and control of MPI. They identified HCI that does not provide medical services, and rather, is a not-for-profit that administered programs for the Illinois Department of Aging. In doing that, the HCI had unwittingly created a golden goose of potential Medicare recipients. HCI was screening people for programs such as Meals on Wheels and home heating assistance that are operated through the Illinois Department of Aging, non-medical programs for individuals who would fit perfectly with home health agencies that look to provide home health services for seniors in their home, to be ultimately paid for by Medicaid. HCI was essentially doing defendant canvassing for clients for them. There was a pre-existing relationship, and when I say pre-existing, I mean pre-existing the management services agreement that is issued in this case, between HCI and Physician Care Services and Vital, whereby Physician Care Services and Vital would receive referrals, direct one-patient referrals from HCI when HCI's care coordinators and case managers identified clients of HCI. They could benefit from home health services. The testimony of trial made clear that that rotating list procedure was completely legitimate and was done in an honest and apparently successful effort to prevent any one entity from obtaining preferred status and access with respect to HCI's elderly client population. Management Principles, Inc. came up with an idea for the management services agreement, which they later said was a, quote, data mining, close quote, idea. The testimony clearly showed that that management services agreement constituted $90,000 in payment to HCI and that that management services agreement constituted a manipulation of the gatekeeping role of HCI with respect to HCI's clients. There is no dispute that the testimony of trial showed that HCI's rotating list procedure with respect to healthcare referrals was subverted and bypassed by the management services agreement and the access that descendants lost to HCI's files through their data mining. In fact, the people who were conducting the data mining, the witnesses that testified at trial, never heard of data mining and did not know that's what they were supposedly doing. What they were doing was calling for funds. And that's exactly what the evidence showed happened. There's no dispute that that's what was happening. Defendants did not dispute that defendants' employees were calling the clients of HCI and signing them up for healthcare services that defendants provided and billed the United States government for under the Medicare program. Through the management services agreement, defendants paid HCI $90,000 and in turn received $720,000 worth of Medicare business. If this is not an illegal kickback, it's the most brilliant marketing idea I've ever seen to restate. They have identified a way, the defendants identified a way to find a group of patients which would be right for their services and which they did not have to find and which coincidentally had just been screened for government programs. And as part of that screening, they purchased, clearly purchased as they admitted, the data that they were mining. And that data was the telephone numbers they could use to call these people, their Medicare numbers that they could use to bill for their healthcare services, their primary care physician's information, their healthcare diagnoses, their prescription medications, and all manner of other things that is never available for public say. Mr. Willis, this is Judge Ripple. What evidence is there in the district court's opinion? What can you point to show us that the district court misunderstood the breadth of the term? Exactly what's wrong with the, where in the district court's opinion are we going to find this misunderstanding of referral? Thank you for that question. I think that's an excellent question to focus on. The district court speaks of whether or not there is evidence of a quid pro quo relationship between HCI and MPI for referrals and states that finding none, the district court will not assume that there is an agreement. In doing so, the district court clearly deviates from the applicable standards where the case law repeatedly guides the court to look not to what the main purpose of a payment is or what perhaps the primary purpose or the stated purpose is, but all particular purposes, all potential purposes. And whether even a portion of the purpose may be to influence the gatekeeping role with respect to referrals for healthcare. I'm sorry. I was going to ask, besides Patel, to what other case would you invite our attention on that point? What other case really says we shouldn't look at the quid pro quo relationship and look at the broader significance of the scheme? I think particularly apt to this case is the Barassi decision where they look at employment relationships or supposed employment relationships with people who are supposedly providing services to the recipient of these healthcare referrals. And in that decision, it makes clear that the inquiry there was not done here. The Barassi court looks in detail by saying, okay, what was supposedly the reason for this payment and can we look and see was that done? Was that applicable? And I think particularly to this case, the safe harbor provisions from the CFR as to what constitutes a permissible professional services agreement is also applicable. But returning to Barassi, they look and specifically say these individuals were being, these doctors in that case, were being paid for work that was not done. That's exactly what the testimony is here. And there's no dispute that that's the case. These $90,000 payments were stated as being to hire associate managers for the management services agreement, and it's undisputed. There were no associate managers. The management services agreement makes clear that those associate managers were to create timesheets. In Barassi, at least the defendants took the step of trying to cover their tracks and created false timesheets. Here, no one even made that step of trying to pretend like any work was being done. I think the Barassi court made clear that we can't just look at what the stated reason is for an agreement. We have to look at all of the potential reasons for an agreement. There, as in the fact before the district court, there were written agreements and professional services agreements that arguably on their face could have come within the safe harbor provisions. But the testimony here and there in Barassi showed that those were illusory. And in doing so, the Barassi court looked and said, if we see that the purposes for which the stated purposes for which the payments were made is not being followed, we can reasonably infer that the other thing that's being exchanged between the parties, health care referrals, is what's being paid for. And in this case, that's precisely what we have. Besides looking at the fact that these associate managers were apparently never appointed, what other evidence is there in the record that the arrangement that Mr. Saeed testified about was a shell and that there was something else going on? The thing that bothers me about this case is really the dearth of evidence. Can you point to anything else to substantiate the fact that this whole thing was on the surface, at least because it's just a shell? There's something else going on besides what appeared on the surface. Yes, certainly. Another thing that Asa Saeed came up with as a potential explanation for what was going on was that the HCI employees, in addition to dedicating their staff to the associate managers, they were supposed to be training the MPI employees as to what HCI did as case management. And in the record, this is where Mr. Saeed came up with this idea that he was investigating the potential of forming an accountable care organization. Mr. Willis, you are at five minutes. Those trainings never happened. Ms. Cutright, Rosetta Cutright, testified that she never received those trainings. Rosetta Cutright was the person that Defendant Saeed said was supposed to be receiving those trainings. Alice Piorarski also said, I did not receive those trainings. And I think most pointedly in this case to address Justice's question is the fact that both of them testified that if they were to receive those trainings, they would have been useless because that was information that they already knew. And when I refer to that, I refer to what Mr. Saeed testified was the purpose of the training, the coordination of multiple aspects of care for seniors. Both Ms. Cutright and Ms. Piorarski said, A, any such training never happened. They were never told that they were supposed to receive any training, and they didn't, in fact, receive such training. And that, B, even if they had been sent for that training, it would have been commercially useless because they already knew that information. That had been their jobs all along, both with the defendants and previously. And so we look to the CFR Safe Harbor Guidelines, which were put into affirmative defense in this case, given the posture, obviously, the court never got to that. And we can see a clear seven-part test, one of which is, were the services contracted for commercially reasonable under the circumstances? Now, in this case, it's clear that they weren't. Mr. Willis? Yes. Mr. Willis, good morning. It's Judge Sutter. The question I have is, when I read the Management Services Agreement, there's a pretty clear disconnect between the whole data mining rationale and what you read on the face of the Management Services Agreement. In other words, I don't take away from reading the agreement that this is about data mining and about an interest that MPI may have in time of becoming one of these so-called ACOs, et cetera. The question I have is the following. Is it significant, in your judgment, that the Management Services Agreement lacks any express provision prohibiting MPI from using information that they would obtain in HCI's files for contacting prospective clients or patients about medical services? The absence of any provision like that significant? Your Honor, I don't believe that the absence of any provision like that would be significant, and I say would be because there is a provision in the Management Services Agreement that addresses that point. I don't have it in front of me as to what the exact citation is, but there is a provision in the services that deals with protected health information that would be governed by HIPAA and relate to what can and can't be used for that, what that information can and can't be used for. And I think under the terms of the Management Services Agreement itself makes clear that soliciting people for business is not one of the legitimate purposes. As Justice Cutter just noted, the Management Services Agreement does not explain data mining. The Management Services Agreement does not explain that this is part of investigation for the formation of an accountable care organization. In fact, the Management Services Agreement is remarkably vague as to what the purposes of the Management Services Agreement is. In comparison, when we look at 42 CFR 1001.952D, subparagraph 2, a safe harbor protected Management Services Agreement is required to, and I quote, the agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided to the agent. Mr. Willis, you have about a minute left. Do you want to reserve that for rebuttal? Thank you, Your Honor. I'll just finish this point. To Justice Cutter's question, and I think it's an apt one, the Management Services Agreement here is quite vague. And based on the testimony at trial, it seems clear why it was vague. The people who were carrying it out were left in the dark as to what they were doing. And there's a clear reason why. The Management Services Agreement is a sham. And the fewer the people defendants let know that was a sham, the better for them. Unfortunately, the evidence came out and showed at trial that these were, under applicable law, referrals that were being paid. Thank you. Thank you, Mr. Willis. We'll now hear for counsel for the appellee, Mr. Spivak. Your Honor, it's Barry Spivak for the appellee. Mr. Willis, Your Honors, in order to make out a prima facie case that defendants violated the Kickback Act, plaintiff had to show that the defendants intended to defraud, which under the act requires showing they had knowledge of what they were doing was unlawful. What the district court found was that the plaintiff did not present any evidence of a connection between the alleged giving of gift cards or the Management Service Agreement or that any connection was expected. In other words, there was no intent to violate the act. Now, I know the district used the words quid pro quo once, but she did not use the phrase in the sense that it seems like plaintiff implies, that there had to be some one-to-one, whether plaintiff had approval, one-to-one connection with a particular patient. I don't think plaintiff did, but the district court's decision was that plaintiff did not present evidence that the gift cards or Management Services Agreement were intended to induce referrals. The evidence pointed to no connection between the gift cards or agreement and any illegal conduct. In our view, of course, we think this case should have stopped with the analysis of the gift cards, which was the centerpiece of the complaint. Those allegations turned out to be completely false. Plaintiff did not call a single witness to substantiate the theory that anyone at MPI gave gift cards to anyone at HCI to induce referrals. The only evidence came from Alice Piewarski, who was mentioned prominently in the complaint, and she said that she would give maybe a $5 or $10 Dunkin' Donut gift card for somebody's birthday or shower, but nothing like the allegations in plaintiff's complaint that she was handing out all the time target gift cards in amounts between $50 and $250 to obtain referrals. At the trial, she questioned who could possibly have suggested as much. With respect to the Management Services Agreement, the district court found simply that there was no testimony that the $5,000 monthly payments were made for the purpose of obtaining referrals. Mr. Saeed testified that the reason for the Management Services Agreement was for exploring the possibility of becoming an accountable care organization, which was a feature of the recently passed Affordable Care Act. Unlike HMOs, ACOs are formed by providers rather than insurance companies and are accountable for the quality of care to a particular patient population. ACOs are reimbursed based on performance metrics. Basically, it's value-based, unlike HMOs, and there are incentives to keep costs down. One of the many requirements to becoming an HCO and being an HCO is you must be able to provide services to at least 5,000 Medicare beneficiaries over the course of three years. Mr. Saeed felt he could not go out on his own and find 5,000 patients to analyze and use them to predict what kind of services an ACO would confront based on the needs in that area, but he thought he could utilize HCI's database and patient population because that would tell him how many people suffered from cardiac health issues or diabetes, and he could use it to predict future trends by looking at the data. He could that way forecast the needs of a particular patient population and, using analytics, decide whether it was financially feasible to become an HCO. The agreement was supposed to run for 30- Did you hear that? Yes, sir. It's Judge Scudder. I have a question for you. It's really two questions. Do you agree that the evidence would support a finding, just as a matter of fact, that MPI, under this agreement, acquired access to HCI's client information and that, at least on occasion, MPI personnel would then go back to their shop and reach out to different contacts to try to develop business for MPI's sister companies? Do you agree, as a matter of fact, that that's just what happened, at least in some instances? I think it's a little unclear. I understand where the court is coming from on that because there was testimony about contacting beneficiaries. What is a little less clear is whether that was occurring, I think, during the period of the management services agreement when there were payments being made and whether that was allowable under the management services agreement. You may recall that the lawyer, Mr. Spadoni, was aware of the fact that MPI would contact people. So I think that was considered to be permissible under the management services agreement. And certainly, Mr. Saeed believed it was. But it's really unclear as to whether when those contacts were made. Remember, the agreement was only in effect for like 18 months because, at that point, Mr. Saeed decided that it was not financially feasible to do this. I mean, it was worth it to him to do this serious data mining and basically, eventually, you do analytics to decide because the ACO is different from an HMO in that the ACO, what you have is a series of providers getting together, not an insurance company. And the idea is to try to reduce the cost of services that CMS is paying because you're rewarded, you're given incentives for keeping costs down, and you're penalized if the costs go up. And so that is what the purpose of the ACO is. And in order to determine whether it's going to be financially feasible to you, and this is what Mr. Saeed was facing, he's got to look and see like, okay, this is the population in the area. What kind of diseases do they have? Do they have cardiac diseases? Do they have diabetes? What would be our cost in order to give value-based care? Okay, here's my second question. It's entirely hypothetical. Let's just stipulate for discussion purposes that there's a physical therapist that pays an orthopedic surgeon for access to the surgeon's patient files and contact information for patients, and that the stated purpose of doing so is so that the physical therapist can obtain new patient referral information. On that hypothetical, would that arrangement, in your view, violate the anti-kickback statute? I'd have to know more facts about it. What facts would you need to know? I'm trying to, like, gather what you said, that basically the therapist is paying the doctor in order to get patients? A physical therapist provides physical therapy to people that have different orthopedic surgeries. And so the physical therapist thinks, well, what better source of business than for me to gain access to the surgeon's files and get contact information for people that are going to have surgeries? And then what I'm going to do is I'm going to contact them. I'm going to say, I understand that you had a shoulder surgery or a knee replacement or what have you. I'm a physical therapist. I'd like to provide therapy for you. That access to that information is what the therapist pays the surgeon for. Would that arrangement violate the anti-kickback statute? I don't think it would necessarily violate the anti-kickback statute. If there was just to obtain information, I don't think it would violate the anti-kickback statute unless it was a For the express purpose of obtaining. See, what I'm worried about, if that's your answer, what I'm worried about is what the definition of referral means within the statute. How do we define referral? I'm sorry. No, because in that hypothetical, if the surgeon says, well, I didn't refer anybody. I just opened up access to my database. Is that kind of construction consistent with what we said in Patel? In Patel, what happened was that basically, if I remember Patel correctly, Patel still said that the kickback must be in return for a referral. What happened was the payment was made when there had been a referral by apparently like employees of Grand in that particular case, but the actual referral was made when the physician got the money in order to sign up on the Form 485. That was a clear indication of payment for referrals in Patel. Okay. And so why not in my hypothetical? Well, I guess it could be if the purpose is to obtain referrals, if that's the purpose of it. But that was not the purpose here. The purpose here was not to obtain referrals. Okay. I'm sorry. I don't want to interrupt. No, I was going to say, and my only question is, do you glean the purpose from the four corners of the, what's it called, the MSA? Yes. I will agree with Mr. Willis. It is vague, the MSA. But I would say that all the testimony, both from the MSA, with respect to the MSA, because it did talk about looking at reviewing charts and I had it in front of me. It talked about giving oversight, developing an implementation of a program, chart review, things like that. But also just from the fact when you're talking about Mr. Saeed's intent, just from talking to the lawyer, Mr. Spadoni, that didn't think that there was anything improper about what he was doing. So the only testimony, although the MSA is a bit vague, the only testimony would be that was what the judge found, which is that Mr. Saeed did not intend to violate the Anti-Kickback Act. That was the only evidence in the case at this stage. And I was going to get to that, that basically Mr. Spadoni said it was okay that we were looking at charts and doing these things. Ella Grace said that there were conversations when they were talking about the Management Services Agreement, conversations about the data mining. And this was important for Mr. Saeed in order to determine whether to become an ACO. In the end, he decided not to become an ACO. And it's interesting that after he stopped the decision to become an ACO, there was still some data mining apparently going on, but he wasn't paying any money for it, which seems to show that he wasn't paying money in order to solicit clients because once he decided not to go ahead with the ACO, it ended. So I think it's our view that basically based on the evidence, the judge made a decision. She believed Mr. Saeed. She believed what he was saying, and she believed that this ACO idea was not some sort of ruse, as Mr. Willis paints it, but it was legitimate that Mr. Saeed was trying to find that out. This was something that was created through the Affordable Care Act, and Mr. Saeed was trying to come under the Affordable Care Act, and the only way he could do it was to be able to find out if he could find a population of 5,000 patients and it would be financially feasible for him to do it. The whole thing really is just a question of intent. The judge made a factual finding that there was no intent to violate the law, and I think for that reason the judge's decision has to be affirmed. Thank you, Your Honors. Thank you, Mr. Spivak. Mr. Willis will grant you one minute of rebuttal. I'll use that one minute to note that what Mr. Spivak just said with the judge determining that Atif Saeed's testimony was credible is simply not true. That's not in the record before this court, and it's not in the district court's decision. The district court did not make a finding that it believed Atif Saeed as to where his testimony was in conflict with what the evidence as to what actually happened was. That's not true. And were that the case, certainly this would be a different appeal. The district court's decision does not include any findings that this party was credible, that party was not, this testimony overrides that. It's a simple application of what is a referral. As the justice's question with respect to the physical therapist and the orthopedic surgeon makes clear, there are things, such as the situation in Patel, where there is not a direct go-serve-this-patient type referral. That is still an illegal referral for purposes of the anti-kickback statute. The district court missed that in its application of the laws of the fact here, and because of that, reversal is required. Thank you, Mr. Willis. Judge Ripple, did you have any further questions? No, thank you. Judge Scudder, did you have any further questions? None from me. Thank you to everyone. Thank you to both counsel. This case will be taken under advisement.